IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Hogan Field Hangars, LLC, et al., :
: Case No. 1:12-CV-388
:
Plaintiffs, :
:
v. :
:
Butler County Board of Commissioners, :
et al., :
:
Defendants. :

## O R D E R

This matter is before the Court on motions for summary judgment filed by Defendants Butler County Board of Commissioners, Ronald W. Davis, and Gary L. Sheets (Doc. No. 18) and Defendant Robert Mortimer. Doc. No. 19. For the reasons that follow, the motion for summary judgment filed by Defendants Butler County Board of Commissioners, et al., is **GRANTED IN PART AND MOOT IN PART**; Defendant Mortimer's motion for summary judgment is well-taken and is **GRANTED.** Plaintiffs' federal constitutional claims are **DISMISSED WITH PREJUDICE**; Plaintiffs' state law cause of action for a writ of mandamus is **DISMISSED WITHOUT PREJUDICE.** Plaintiffs' motion to strike (Doc. No. 39) is **MOOT.**

I. Background

Plaintiffs in this case are Hogan Field Hangars, LLC, an Ohio limited liability company, and Frederick D. Hogan.[1] Plaintiff Hogan and his brother, Tom Hogan,

---

[1] Donald A. Doheny, Jr. was also an original plaintiff in this case but he voluntarily dismissed his claims with prejudice prior to the dispositive motions deadline. Doc. No.

1

formed Hogan Field Hangars for the purpose of constructing a hangar at the Butler County Regional Airport-Hogan Field from which to operate a flying service and to store airplanes.  Complaint ¶ 12.  Hogan's father and uncles actually developed Hogan Field in the 1930's and operated the airport as a private venture until the mid-1980's, when they sold it to a regional airport authority.  Butler County purchased the airport in 1999 and renamed it "Butler County Regional Airport."  The airport is owned and controlled by the Butler County Board of Commissioners, but run on a day-to-day basis by the airport administrator, Defendant Ronald W. Davis.  In 2002, the county commissioners passed a resolution to rename the airport "Butler County Regional Airport - Hogan Field" in order to recognize the Hogan family's contributions to the development of the airport.  Local signage was amended to reflect this name change but the airport remained named "Butler County Regional Airport" in official Federal Aviation Administration ("FAA") records.

In any event, as stated, the Hogan brothers formed Hogan Field Hangars in 2009 to build a new hangar at the airport.  As explained by Plaintiffs in their brief, in addition to obtaining the necessary zoning and building permits, the general process for building a new hangar involves entering into a ground lease with the county for a lot at the airport on which to build the hangar, and then obtaining financing to build the hangar. Typically, when the lease expires, the land and the hangar revert to the county.

---

15. The complaint describes Doheny as a family friend of the Hogans and as an attorney licensed to practice law in Indiana.  Complaint ¶13.  Defendants characterize Doheny as a lobbyist in their papers.  However one refers to him, Doheny is a central figure in this controversy, as will become evident below.  For ease of reference, the Court will generally refer to the Hogan Field Hangars and Frederick Hogan collectively as "Plaintiffs."

2

In this case, in May 2010, Hogan Field Hangers entered into a 20-year ground lease with the county for lot C-13. One term of the lease provided a 30-day period for the lessee to remedy a default. See Doc. No. 32-1, at 14. After signing the lease, Plaintiffs sought financing to build the hangar from the Small Business Administration ("SBA"). There was a critical snag, however - the SBA required a 60-day default provision in the lease before it would approve funding for the project.

Plaintiffs requested, through Defendant Davis, that the county modify the ground lease to provide a 60-day default provision so they could obtain the SBA loan. Although he did not have final authority over the decision, Davis told Plaintiffs that the county would not agree to this modification because all of the other ground leases at the airport had 30-day default provisions. Davis never presented Plaintiffs' request for a modification to the Board of Commissioners nor did he make a recommendation to the Board on their request. Doheny, however, directly raised the issue of the lease modification with the Board on Plaintiffs' behalf during a public meeting and Hogan sent emails to each individual county commissioner requesting the modification. E.g., Doc. No. 32-2, at 16. Hogan's email to the commissioners was also critical of Davis's administration of the airport generally and his handling of their lease modification request specifically. In any event, the county commissioners never acted on Plaintiffs' request to modify the lease and they were forced to obtain conventional financing, which increased the cost of building the hangar.

In the meantime, while the default modification problem dragged on, lease payments to the county started coming due. Plaintiffs requested Davis to delay their obligation to start making payments until they obtained financing for the hangar. Davis,

3

however, refused Plaintiffs' request on the grounds that they had already started construction of the hangar.

Doheny figures in two other notable episodes in this case.

First, at the same time the problems with the SBA loan were ongoing, Doheny was petitioning the FAA on the Hogans' behalf to add "Hogan Field" to the official name "Butler County Regional Airport."  In response, someone from the FAA contacted Defendant Sheets, who was and is legal counsel for the Board, about Doheny's request to change the name of the airport.  Sheets responded by telling the FAA that the county commissioners had not authorized to Doheny to approach the FAA about changing the airport's name.  Sheets Dep. (Doc. No. 32) at 22-33.  Subsequently, Henry Felices, who apparently was the responsible FAA official, wrote an email to another FAA employee, Thomas Harris, telling him not to process Doheny's request because "[t]he FAA considers the airport name as a legal name that requires legal documentation from an authorized airport official before it can be changed" and that "[t]his name change as submitted by a non-airport official was erroneous and illegal and unauthorized."  Sheets Dep. Ex. 18 (Doc. No. 35-2, at 1).

Second, in May 2011, Dan Ferguson, an assistant county prosecutor, received a complaint from a local citizen that she had paid Doheny $1,500 for legal services which he failed to perform.  Ferguson did some research and discovered that Doheny was not licensed to practice law in Ohio.  Ferguson opened a criminal case inquiry and subpoenaed Doheny's bank records to discover if anyone else had possibly paid him money for legal services.  In September 2011, another assistant prosecutor, Bob Roberts, forwarded to Ferguson an email authored by Defendant Sheets which stated

4

that Doheny might have been engaged in the unauthorized practice of law when Doheny appeared before the county commissioners on Plaintiffs' behalf about the ground lease modification.  Ferguson then had a spreadsheet prepared from Doheny's records to identify other potential victims and discovered that Plaintiff Hogan had paid Doheny approximately $11,000 between January 2011 and June 2011.  See Doc. No. 18-1.[2]

Ferguson dispatched Defendant Robert Mortimer, an investigator for the prosecutor's office, to interview Plaintiff Hogan about his payments to Doheny.  Mortimer's affidavit states that Hogan refused to give him information about his payments to Doheny.  Doc. No. 19-2, at 2.  Hogan testified that Mortimer told him not to be "spooked" by his investigation.  Hogan also testified that Mortimer asked him about what conflicts he had with the county commissioners.  In response, Hogan testified that he joked that his conflict with the county commissioners was about adding "Hogan Field" to the name of the airport but that "[wasn't] really a conflict because it had been resolved in 2002."  Hogan Dep. (Doc. No. 25), at 36-37.  Hogan then said that he told Mortimer that his "real conflict" with the county commissioners was that they did not approve his SBA loan.  Mortimer, however, cut Hogan off and said, "Oh, I don't want to talk anything about that."  Id. at 37.  It is not clear on the record how the interview ended, but Hogan said that he felt that Mortimer's question about his conflicts with the county commissioners was inappropriate.  Moreover, Hogan claims that he thought Mortimer's statement not to be "spooked" was an implied threat to stop criticizing the

---

[2]  The spreadsheet and cancelled checks are the subject of Plaintiffs' motion to strike.

5

commissioners and to stop making public records requests. Id. at 37-40. Hogan testified later though, that he continued to criticize both the county commissioners and Davis's administration of the airport after his interview with Mortimer. Id. at 72-73.

In May 2012, Plaintiffs filed a complaint against the Butler County Commissioners, and Defendants Sheets, Davis, and Mortimer asserting several federal constitutional claims and a state law claim for a writ of mandamus. Plaintiffs' federal causes of action include a "class of one" equal protection claim, a First Amendment retaliation claim, and a failure to train claim. Plaintiffs' state law mandamus claim seeks to compel the Defendants to produce records subject to disclosure under the Ohio Public Records Act.

Following discovery, Defendants filed motions for summary judgment which are ready for disposition. After briefing was concluded, Plaintiffs filed a motion to strike documents Defendants submitted with the affidavit of Dan Ferguson on the grounds that they were not produced during discovery despite being responsive to their documents requests. The Court, however, concludes that Plaintiffs' motion to strike is moot because Defendants are entitled to summary judgment even if the subject documents are stricken from the record.

## II. Summary Judgment Standard of Review

Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving

party, who is given the benefit of all favorable inferences that can be drawn therefrom. United States v. Diebold, Inc., 369 U.S. 654 (1962). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original). The Court will not grant summary judgment unless it is clear that trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Id. The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. Poller v. Columbia Broad, Sys., Inc. 368 U.S. 464, 472 (1962). "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." First Nat. Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored

7

…

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  Significantly, the Supreme Court also instructs that the "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. Id.; Anderson, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

8

III. Analysis

A. Equal Protection - Class of One

A claim for an equal protection violation under a "class of one" theory is not based on the plaintiff's membership in a particular class or group. Davis v. Prison Health Serv., 679 F.3d 433, 441 (6th Cir. 2012). Rather, a class of one claim alleges that governmental officials treated the plaintiff differently from others similarly-situated and that there is no rational basis for the difference in treatment. Id. Courts, however, view class of one claims with skepticism because they have the potential to have juries second-guess the legislative process. Loesel v. City of Frankenmuth, 692 F.3d 452, 461 (6th Cir. 2012). Thus, the plaintiff has a "heavy burden" to prevail on a class of one claim. Id. at 462. The plaintiff must first prove that he was treated differently from those similarly-situated in all relevant respects. Id. Additionally, the plaintiff must prove that the adverse treatment was "so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational." Id. The plaintiff can satisfy this burden by "either negativing every conceivable reason for the government's actions or by demonstrating that the actions were motivated by animus or ill-will." Id.

In this case, Plaintiffs' class of one claim has three facets. First, Plaintiffs allege that Defendants violated their right to equal protection by refusing to modify the notice of default provisions in the ground lease, although Defendants allegedly had done so in the past for other airport lessees. Second, Plaintiffs allege that Davis violated their right to equal protection by failing to make a recommendation to the county commissioners

9

on their request for a modification, even though it was allegedly his practice to make recommendations to the board on such requests. Third, Plaintiffs allege that Defendants treated them differently from other lessees by refusing to delay their obligation to begin making lease payments while they worked out the financing problems. Plaintiffs allege that Davis's actions in particular were motivated by ill-will towards the Hogan family having its roots in several past incidents. As to the first and third subclaims, Defendants argue that they are entitled to summary judgment because Plaintiffs have failed to identify any similarly-situated airport lessees whom they treated more favorably than Plaintiffs. As to the second subclaim, Defendants argue that Davis's failure to make a recommendation to the county commissioners on their request for a lease modification was harmless since they were able raise it with the board directly.

With respect to the first and third subclaims, the Court agrees with Defendants that Plaintiffs have failed to identify any similarly-situated airport lessees who were treated more favorably than them. This is true even though the similarly-situated inquiry does not require an "exact correlation" between the plaintiff and other individuals, but rather only relevant similarity. Loesel, 692 F.3d at 462.

First, with respect to modifying the notice of default provisions in the lease, the record shows that Defendants actually treated Plaintiffs the same as other airport lessees. Plaintiffs produced evidence that the county commissioners approved modifications to the leases of two other tenants, but as Defendants correctly point out, in both of those cases the leases still included 30-day notice of default and cure provisions. Doc. No. 32-3, at 17 § 4; Doc. No. 32-3, at 24 § 4. Thus, by refusing or

10

failing to approve Plaintiffs' request to modify their lease, Defendants only required Plaintiffs to have the same notice of default provisions as the other airport tenants. Consequently, with regard to this subclaim, Plaintiffs have failed to identify a similarly-situated individual who was treated more favorably than them.

Second, Plaintiffs have failed to identify a similarly-situated tenant with regard to delaying their obligation to begin making lease payments. Plaintiffs identified only one prior case where the county commissioners agreed to defer the tenant's obligation to begin making lease payments to the county. In that prior case, as Defendant Davis explained in his deposition, the tenant had not broken ground on building the hangar when it requested a deferment, whereas Plaintiffs had started to build their hangar before securing their financing. Davis Dep. (Doc. No. 26), at 39. Moreover, in the prior case, Davis testified that he induced the tenant to sign a lease in order to secure the lot, even though there were no taxiways to that area of the airport, because he had obtained FAA funding to extend the taxiways. There were design and engineering issues, however, between that tenant and another tenant in the same area about access roads that were not resolved until winter set in. But by that time, however, the tenant could not begin construction on his hangar until spring. Id. at 39-40. Davis testified that he "honored what I had told him; I recommended to the commissioners if they back it up [sic] until he breaks ground." Id. at 40.

Davis's testimony indicates significant differences between Plaintiff's case and the earlier case concerning deferring lease payments. First, the earlier tenant had yet to begin construction on his hangar when he requested a deferment whereas Plaintiffs had already started building their hangar when they made their request for a deferment.

11

Second, and more critically, Davis's testimony indicates that he felt a moral obligation to recommend a deferment for the earlier tenant because he had persuaded him to enter into a lease for a lot that had no access, before the tenant was otherwise ready to build, apparently under the assumption that there would be no problems providing access to the area. Unforeseen circumstances, however, prevented that tenant from being able to begin construction on his hangar by the time the lease payments started coming due. But for the fact that Davis persuaded the tenant to enter into the lease prematurely, he would not have had to begin making payments on a lot he could not access.

Plaintiffs' situation, on the other hand, did not present the same equitable issues as the first tenant. Plaintiffs do not indicate that Davis or any of the other Defendants induced them to sign the lease before they were actually ready to proceed with their project. The fact that Plaintiffs entered into the lease apparently without knowing about all of the requirements to obtain an SBA loan was not Defendants' fault. Although negotiations over modifying the lease went on for several months, Plaintiffs knew as early as June 2010 that the county was refusing to modify the notice of default positions. Thomas Hogan Aff. (Doc. No. 32-1) ¶ 16. Although Plaintiffs cannot necessarily be criticized for their persistence in pursuing a modification to the lease, by the same token, they certainly had the opportunity to make alternative financing arrangements in order to complete their hangar in a timely fashion. In other words, as opposed to the case with the earlier tenant, the fact that Plaintiffs had lease payments come due before construction of the hangar could get fully underway was largely a problem of their own making.

The record indicates a rational basis for Defendants' disparate treatment of

Plaintiffs concerning deferment of lease payments: 1) the earlier tenant had not begun construction on his hangar when he requested a deferment whereas Plaintiffs had begun construction on their hangar; 2) Defendants, and Davis in particular, caused the first tenant to enter into the lease before he was fully prepared to begin his project whereas Defendants had not created a similar reliance interest when Plaintiffs signed their lease; and 3) unforeseen circumstances delayed the first tenant's ability to begin construction of his hanger whereas Plaintiffs had an opportunity to avoid delays in their project by either by performing better due diligence on SBA financing requirements or by seeking alternate financing arrangements earlier than they did.  Thus, the Court concludes that the differences between Plaintiffs' case and the earlier tenant with respect to deferment of lease payments are material as a matter of law.  EJS Properties, LLC v. City of Toledo, 698 F.3d 845, 865-66 (6th Cir. 2012) (holding that the differences between the parties were material, and hence they were not similarly-situated as a matter of law, where the government had a rational basis for the differences in treatment).  Consequently, Plaintiffs have not identified a similarly-situated individual with respect to Defendants' refusal to allow them to defer making lease payments on their lot.

     Finally, with respect to Plaintiffs' second subclaim, the Court agrees with Defendants that Davis's failure to make a recommendation to the board on their request for a modification of the lease was harmless.  First, Plaintiffs were able to raise the request for a modification directly to the commissioners.  Second, and more importantly, Davis was clearly opposed to modifying the lease.  Therefore, any recommendation that

Davis would have made to the commissioners would have been negative and a negative recommendation surely would not have been helpful to Plaintiffs.  In other words, as Defendants point out, a negative recommendation from Davis would have been more harmful to Plaintiffs than no recommendation at all.  In essence, this subclaim simply fails to demonstrate that Davis took any adverse action against Plaintiffs.

In summary, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

### B. First Amendment Retaliation

Plaintiff Fred Hogan alleges that Defendants retaliated against him for exercising his right under the First Amendment to criticize the government and to petition the government to redress grievances.  More specifically, Hogan alleges that Defendants retaliated against him for requesting a modification to the ground lease and for requesting the FAA to change its records to add "Hogan Field" to the name of the airport.  The nature of the alleged retaliation appears to be limited to Defendant Mortimer's questioning of Hogan during his investigation into the criminal complaint lodged against Doheny.[3]  Hogan may also be contending that Defendant Sheets retaliated against him by calling his petition to the FAA to change the name of the airport "illegal."

---

[3]    Hogan arguably did not adduce any evidence of retaliation during discovery inasmuch as his brief states that "[t]he determination of whether retaliation occurred is in itself an issue of fact which is improper to dispose of on summary judgment."  In other words, Hogan apparently cannot put his finger on any concrete retaliatory action Defendants took against him.

In order to prevail on a First Amendment retaliation claim, the plaintiff must establish three elements: 1) he engaged in constitutionally protected activity; 2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) the adverse action was motivated at least in part by the plaintiff's protected conduct. Mezibov v. Allen, 411 F.3d 712, 717 (6th Cir. 2005). While Hogan can satisfy the first element, his retaliation claim fails as a matter of law on the last two elements for several reasons.

First, as the Court has already suggested, Hogan has failed to identify any adverse action that was taken against him. The record is clear that Defendant Mortimer interviewed Hogan because he was a potential victim related to a criminal complaint that a private citizen lodged against Doheny. In other words, Mortimer was there to investigate Doheny, not Hogan. Even though Mortimer asked Hogan about his rift with the commissioners, Hogan admitted that Mortimer did not want to discuss the only relevant dispute he had with the commissioners. Hogan's interpretation of this interview as an attempt to intimidate him is simply unreasonable.

Second, the same analysis illustrates that Mortimer's investigation was not motivated by Hogan's protected activity. Despite a loose temporal proximity of the some of the events in the case, Hogan has not rebutted Defendants' evidence that Mortimer's investigation was initiated independently of Hogan's protected activity in response to a citizen complaint about Doheny.[4]

---

[4] This remains true even if the Court strikes from the record the documents that Defendants failed to disclose during discovery. As Defendants point out in their brief in response to the motion to strike, the documents merely corroborate Ferguson's and Mortimer's testimony that the investigation into Doheny, and the subsequent interview of

15

Third, to the extent that Hogan's retaliation claim is based on petitioning the FAA to change the name of the airport, he has misconstrued the record. Defendant Sheets did not call Hogan's request to the FAA "illegal." The email Hogan submitted in the record plainly shows that FAA official Felice called Hogan's petition "illegal" in response to Defendant Sheets's accurate statement that the county had not authorized Doheny to approach the FAA about changing the name of the airport. See Hogan Aff. (Doc. No. 32-2) ¶ 22 (stating that Doheny made an application to the FAA to change the name of the airport and that Hogan and Doheny worked together on the petition); Sheets Dep. (Doc. No. 35) at 449 (testifying that county commissioners did not authorize Doheny to apply to the FAA to change the name of the airport). In any event, even if Sheets did call Hogan's FAA petition illegal, this statement arguably is protected by his own First Amendment right of expression, which in turn should not be chilled by this lawsuit. See Mezibov, 411 F.3d at 722 (stating that in analyzing the adverse action alleged by the plaintiff, the court must be careful not to "trample" on the First Amendment rights the defendant retains as a government official).

Fourth, and finally, the record shows that a person of ordinary firmness would not be chilled in his efforts to criticize and petition the government in light of the alleged adverse actions taken against Hogan in this case. Although a plaintiff is not required to show an actual chilling of his protected expression, the fact that Hogan admits that his criticizing and petitioning activities were not actually chilled indicates that the adverse

---

Hogan, originated because of the citizen's complaint and not because of Hogan's protected activity. In other words, striking the documents from the record still leaves intact Ferguson's and Mortimer's unrebutted testimony. Accordingly, the Court concludes that the motion to strike is **MOOT.**

actions alleged are insufficient to chill a person of ordinary firmness. See Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 585 (6th Cir. 2012) (concluding that a person of ordinary firmness would not be chilled by the defendant's alleged adverse action because the plaintiff was not chilled in the exercise of his First Amendment rights).

Accordingly, for all of the above reasons, Defendants' are entitled to summary judgment on Plaintiff Hogan's First Amendment retaliation claim.

### C. Failure to Train

Plaintiffs allege that the county commissioners' failure to train and supervise the individual Defendants led to the alleged deprivation of their constitutional rights. Having failed to demonstrate any underlying constitutional violation, however, Plaintiffs' failure to train claim is subject to dismissal as well. Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir. 2001). Defendants, therefore, are entitled to summary judgment on this claim.

### D. Mandamus

Plaintiffs seek a writ of mandamus to compel Defendants to comply with their records requests under the Ohio Public Records Act. Having dismissed Plaintiffs' federal claims, however, the Court declines to exercise supplemental jurisdiction over this state law claim. Hankins v. The Gap, Inc., 84 F.3d 797, 802-03 (6th Cir. 1996). This claim is **DISMISSED WITHOUT PREJUDICE.**

### Conclusion

For the reasons stated above, the motion for summary judgment filed by Defendants Butler County Board of Commissioners, et al., is **GRANTED IN PART AND**

**MOOT IN PART**; Defendant Mortimer's motion for summary judgment is well-taken and is **GRANTED.**  Plaintiffs' federal constitutional claims are **DISMISSED WITH PREJUDICE**; Plaintiffs' state law cause of action for a writ of mandamus is **DISMISSED WITHOUT PREJUDICE.**  Plaintiffs' motion to strike is **MOOT.  THIS CASE IS CLOSED.**

       **IT IS SO ORDERED**

Date January 15, 2014                                        s/Sandra S. Beckwith
                                                                         Sandra S. Beckwith
                                         Senior United States District Judge